**CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT**

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — specifically, a black Apple iPhone with a cracked screen, ("Subject Device 1") and a black Apple iPhone with a brown case and cracked screen ("Subject Device 2") (collectively the Subject Devices") as described in Attachment A — that are currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2013. I am currently assigned to the Grand Rapids District Office.  Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and the Federal Bureau of Investigation ("FBI"), and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel.  Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to

avoid detection by law enforcement officials. I have investigated drug trafficking organizations for potential violations of federal laws, including, but not limited to, unlawful importation of controlled substances, the distribution of controlled substances, manufacturing of controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, fentanyl, and other dangerous drugs, as well as money laundering.

3.      Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, as well as conspiracy and attempt to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

4.      I know from my training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging

services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable, and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.  Mobile phones often contain evidence of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time. Wireless phones or smart phones also have the capability of facilitating monetary transactions relating to drug dealing, including through the use of cash or bank applications that allow for the electronic transfer of funds.

5.     Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

        a.     Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

        b.     Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business and often store information related to the profits of their narcotics trafficking on their devices;

        c.     User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

d.   Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices;

e.   Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

f.   It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds on their devices. This evidence includes information related to currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers; and

g.   Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service and frequently keep copies of tracking numbers, receipts and photographs of packaged narcotics on their devices.

6.   The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning

this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

7.     Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, distribution and possession with intent to distribute controlled substances, and conspiracy to do the same; Title 21, United States Code, Section 856, maintaining a drug-involved premises; and Title 18, United States Code, Section 922(g) and 924(c), felon in possession of a firearm and possession of a firearm in furtherance of drug trafficking, will be found on the Subject Devices, both of which are described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

## IDENTIFICATION OF THE SUBJECT DEVICE

8.     The Subject Devices, the property to be searched, are described as two Apple iPhones which were seized by law enforcement on June 15, 2022 during the execution of a federal search warrant at a stash house used by Saul BRIGGS and others to facilitate their drug trafficking business. The warrant was jointly executed by DEA and the Michigan State Police. The Subject Devices are currently located at a secure Michigan State Police facility within the Western District of Michigan.

9.     The applied-for warrant would authorize the forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10.     Since late 2019, the DEA, the Michigan State Police ("MSP"), and the MSP-sponsored West Michigan Enforcement Team ("WEMET") have been investigating BRIGGS and other individuals associated with BRIGGS who coordinate drug trafficking activities, the movement of bulk cash, and the facilitation of street violence that frequently includes the use of illegal firearms, assaults, and shootings throughout Muskegon and Muskegon Heights, Michigan. This investigation has included several targets who sold drugs both in the Western District of Michigan and elsewhere, including in the Western District of Missouri.

**A.     BRIGGS distributes a kilogram of fentanyl to an individual in Missouri in March 2022.**

11.     On March 1, 2022, the Honorable Judge M. Douglas Harpool, United States District Court Judge, Western District of Missouri, signed an order in Case No. 6:22-WT-00001 authorizing the interception of communications on two telephone numbers, wire and electronic communications on phone number (417) 894-4307 (WDMO-Target Telephone 1) and wire communications on phone number (417) 689-4501 (WDMO-Target Telephone 2), both utilized by Cameron HATHORN.

12.     During the month of March 2022, DEA-Springfield (Missouri) intercepted a call between HATHORN and BRIGGS as well as calls between HATHORN and other individuals that indicated BRIGGS was supplying HATHORN with kilogram quantities of fentanyl.

13.    For example, on March 9, 2022, BRIGGS and HATHORN had a telephone conversation in which they discussed the exchange of one kilogram of fentanyl for $50,000. During the call, the following exchange occurred (I have included in brackets law enforcement's interpretation of the conversation based upon my knowledge, experience, and familiarity with the investigation):

BRIGGS:    We gonna come down there. [We are going to come down to Missouri.] I said we gonna pull up on you.

HATHORN:    You said what? Oh yeah, I—I like that.

*** 

BRIGGS:    A'right. Imma um, I'm finna see you. When I pull up, I'm finna let you know.

HATHORN:    What, uh, what, let me know the ticket what I tried to tell you. [Let me know how much the fentanyl costs.]

BRIGGS:    Um, shit, what you, what you, what you, what you was trying to do? [How much fentanyl do you want to purchase?]

HATHORN:    I mean, depends on the ticket. If the ticket good, I'll grab a whole one. [It depends on the price of the fentanyl. If it's the right price, I'll take a whole kilogram.]

BRIGGS:    Uh, oh, I been doin', I been, I been, I been doin' 'em at 50. Bro, you. [I've been selling kilograms for $50,000.]

*** 

HATHORN:    Yeah, bring me one of them. [Yes, bring me one kilogram of the fentanyl.]

14. Subsequently, investigators obtained a GPS location ping for warrant for (231) 329-9633,[1] a phone number identified as belonging to BRIGGS and the number he used on the call outlined above. On March 11, 2022, investigators observed the device leave the Muskegon, Michigan area and later arrive in Springfield, Missouri. DEA-Springfield conducted physical and electronic surveillance on HATHORN during this time as well. In summary, investigators observed a white Dodge Ram[2] arrive in the parking lot of an apartment complex in the early morning hours of March 12, 2022. Investigators then observed an occupant of the vehicle, later identified as BRIGGS, meet with HATHORN and exchange a backpack.

---

[1] BRIGGS was identified as the user of phone number (231) 329-9633 in the following manner: The number is subscribed to "Prepaid Customer, 123 Your Street, Your Town, GA 49444" with a service provider of AT&T. I know, based on my training and experience, that drug traffickers frequently provide false information to telephone companies in order to avoid detection or identification by law enforcement. Additionally, following the interception of the March 9, 2022 call, investigators in Springfield, MO contacted your affiant and WEMET officers to assist in the identification of the user of telephone number (231) 329-9633. Detective Merkins then positively identified BRIGGS's voice as one participant on the call. Detective Merkins is familiar with BRIGGS's voice based on his review of social media videos. Later, Missouri investigators also obtained a court order from United States District Court for the Western District of Missouri for GPS location data for phone number (231) 329-9633. Investigators then monitored BRIGGS via electronic and physical surveillance for numerous days. During this monitoring period, investigators determined from electronic data and physical surveillance that the phone assigned call number (231) 329-9633 was continuously in the same location as BRIGGS's person. Law enforcement databases further identify this phone number associated with BRIGGS.

[2] This vehicle is identified as a 2015 white Dodge Ram bearing Michigan registration ENF8856 and is registered to Christian Harold Boyd at 2521 7th Street, Muskegon, MI 49444. BRIGGS frequently drives this vehicle to and from suspected drug transactions and to and from stash locations as well as meetings with other suspected drug dealers. Investigators seized this vehicle during the execution of the same search warrant that led to the recovery of the Subject Devices.

Investigators maintained surveillance on the white Dodge Ram until it departed the area.

15.     Based upon my training, experience, and knowledge of the investigation, I believe that the purpose of BRIGGS traveling to the apartment complex and meeting with HATHORN on March 12, 2022 was to deliver approximately one kilogram of fentanyl to HATHORN in exchange for $50,000, which is consistent with the price of a kilogram of fentanyl in and around the Midwest in early 2022. I further believe that BRIGGS had the $50,000 in drug proceeds from the transaction in the vehicle when the Dodge Ram was stopped by the police following the exchange.

16.     Following the transaction on March 12, 2022, as part of the authorized wiretap in the Western District of Missouri, investigators intercepted calls between HATHORN and others in which HATHORN admitted getting the drugs from "Chain," a nickname for BRIGGS. HATHORN also talked about how the drugs he received were "bad" and that he had contacted "Chain," who was returning to make it right by either bringing new drugs to replace the "bad" ones or to provide HATHORN with a refund. Electronic surveillance subsequently showed BRIGGS's phone returning to the area of the original deal and placed the phone in the same vicinity as HATHORN's vehicle.

## B. Investigators Identify 2060 Letart Avenue as a Stash House Used by BRIGGS and Others to Store Drugs.

17.     In March 2022, investigators also identified the residence at 2060 Letart Avenue in Muskegon, Michigan as a location utilized by BRIGGS and other

individuals on a daily basis. Based on physical and electronic surveillance, investigators believed BRIGGS and his associates utilized the residence as a drug and/or money stash house  to acquire multi-kilogram quantities of fentanyl or heroin, and then to store the drugs at the residence until they could be broken down into smaller quantities and subsequently distributed to customers.

18.     Investigators maintained physical and electronic surveillance on 2060 Letart Avenue starting in or around March 2022.  A subsequent review of electronic evidence from April 1 to June 2022 indicated a pattern of activity that investigators believed was indicative of drug trafficking. Specifically, in both April and May of 2022, investigators observed, via physical and electronic surveillance, unknown individuals arriving at 2060 Letart Avenue and delivering a large, brown box. The boxes appeared to be similar in size to a television box and were brown in color, with no noticeable markings. In April 2022, BRIGGS personally accepted delivery of the box and then walked into 2060 Letart Avenue.

19.     After the boxes were delivered in both April and May 2022, investigators observed, via electronic surveillance, an increase in short stay traffic at 2060 Letart Avenue. I know, based on my training, experience, and familiarity with the investigation, that stays of such short duration are indicative of drug trafficking. Investigators observed a limited number of individuals such as BRIGGS, Bryan RODGERS, and other known associates appear to have exclusive access to the Letart residence.  For example, on May 24, 2022, at approximately 1:38 a.m., a dark colored Tesla, identified as a rental vehicle and believed to be driven by RODGERS, arrived

at the Letart residence and stayed until approximately 7:16 a.m.   No other individuals were observed at the residence during this time period.

20.    For example, on May 28, 2022, at approximately 8:13 p.m., investigators observed BRIGGS in the same white Dodge Ram at 2060 Letart Avenue for approximately 14 minutes.   I believe, based on my training, experience and familiarity with this case, that BRIGGS went inside of 2060 Letart Avenue for a short period of time to pick-up a quantity of drugs and/or money in furtherance of a drug exchange.

21.    During the month of June 2022, investigators identified a similar pattern of activity at 2060 Letart Avenue.  On June 8, 2022 at approximately 12:21 p.m., investigators observed BRIGGS arrive at 2060 Letart Avenue in the white Dodge Ram. BRIGGS then backed into the front driveway of the residence. At approximately 12:47 p.m., investigators observed a maroon-colored sedan arrive at the rear of the residence. Investigators then observed an unknown black male exit the driver's side of the vehicle and retrieve a brown box from the rear driver's side of the sedan. The box was similar in size and shape to boxes observed by investigators being delivered to 2060 Letart Avenue in April and May 2022. Following the delivery of the box on June 8, 2022, investigators observed an increase in short-stay activity at the house by BRIGGS and other drug trafficking associates. This activity was

consistent with the short stay activity observed at the residence in both April and May 2022.

22.     Based on this pattern, investigators sought and obtained a search warrant for 2060 Letart Avenue. See 1:22-mj-00269. United States Magistrate Judge Sally Berens signed the warrant on June 8, 2022.

23.     On June 15, 2022, investigators were conducting surveillance in the area of 2060 Letart Avenue and in other locations relevant to the investigation in and around Muskegon, Michigan. At approximately 1:15 p.m., investigators saw BRIGGS at the Lakes Mall in Muskegon. There, BRIGGS met in the parking lot with a known drug trafficking associate. After staying at the mall for a short period of time, BRIGGS drove to his residence in Muskegon, where he stayed until approximately 3:30 p.m., when investigators saw him leave his residence and drive to 2060 Letart Avenue in the white Dodge Ram.

24.     Upon BRIGGS's arrival at 2060 Letart Avenue, investigators executed the previously authorized search warrant on the residence. Inside, investigators found distribution level quantities of cocaine, fentanyl, and heroin, as well as a small baggie of suspected crystal methamphetamine. Investigators also found cutting agents used to mix drugs for sale, digital scales, several empty brown boxes consistent in size and shape with the boxes previously observed being delivered to the residence

in April, May, and June 2022, multiple presses used to package drugs for sale, and multiple firearms.

25.     In short, the execution of the search warrant at 2060 Letart Avenue and the discovery of evidence of drug trafficking inside the residence corroborated investigators' beliefs about the short-stay traffic at the house, previously observed from March through June 15, 2022, including BRIGGS's arrival at the Letart stash house in the white Dodge Ram in May and June as described above.

26.     When investigators executed the warrant at 2060 Letart, BRIGGS attempted to flee on foot, running out of the house and jumping over the fence behind the residence. Investigators apprehended BRIGGS and took him into custody. No one else was found inside 2060 Letart Avenue at the time that investigators executed the warrant.

27.     Investigators are in the process of obtaining final weights and chemical analyses on the drugs recovered from 2060 Letart Avenue. In total, as of the time of the submission of this affidavit, field tests and visual observations of the drugs confirm the recovery of approximately 8,000 grams of a mixture and substance containing a detectable amount of heroin/fentanyl; over 700 grams of black tar heroin; over 60 grams of cocaine; and over 20 grams of crystal methamphetamine.

28.     Investigators used TruNarc to test the drugs recovered. The TruNarc scans confirmed the presence of fentanyl and cocaine, respectively. Based on my training and experience, these quantities of drugs are consistent with distribution amounts. I also know that the other items recovered from 2060 Letart Avenue,

including the digital scales, cutting agents, presses, and firearms are all tools of the drug trafficking trade.

29.    During the search of the Letart stash house, investigators located the Subject Devices in the northwest bedroom on top of the dresser.  Investigators further located quantities of fentanyl inside several dresser drawers, two loaded firearm magazines and a set of keys with a keychain with the name "Bryan" on it.  Additional quantities of fentanyl, black tar heroin, cocaine and crystal methamphetamine were located in the same northwest bedroom, as well as two firearms in the closet of the same bedroom.  Investigators located multiple baggage claim tickets, a Southwest airline boarding pass, a mattress receipt and an MJ Diamonds receipt in the name of "Bryan Rodgers" in the bedroom.    RODGERS's criminal history includes misdemeanor convictions for possession of controlled substance- marijuana, and felony convictions for carrying concealed weapon, possession of a firearm by felon and possession of controlled substance- cocaine.  I believe, based on my knowledge of this investigation, that RODGERS is an associate of BRIGGS and a co-conspirator in drug trafficking and the utilization of 2060 Letart Avenue as a stash house.  Specifically, investigators have observed RODGERS at the residence via electronic surveillance on at least one occasion as previously described. During the search of the residence, investigators also located rental contract documents for 2060 Letart Avenue that listed RODGERS as a reference for the renter, Cameron Bridgeford.  I know, based on my training, experience, and knowledge of this investigation, that drug traffickers

frequently utilize third parties to rent houses, vehicles, and other property on their behalf in an attempt to evade detection by law enforcement.

30. BRIGGS's criminal history includes state convictions for assault with a dangerous weapon and federal convictions in this Court for possession with intent to distribute cocaine and conspiracy to distribute cocaine. On July 19, 2012, BRIGGS pled guilty to two felonies – conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). *See* Case number 1:12-cr-00123-JTN (WD-MI). On November 1, 2012, BRIGGS was sentenced to 66 months in prison, to be followed by a five-year term of supervised release. On July 8, 2015, the court subsequently reduced BRIGGS's sentence to 60 months pursuant to 18 U.S.C. § 3582(c)(2).

31. Based on the evidence discovered during the search warrant at the Letart Avenue stash house, on June 16, 2022, this Court authorized a criminal complaint charging BRIGGS with three felonies: possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(C); possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). *See* Case No. 1:22-mj-279.  On July 12, 2022, BRIGGS was indicted in the Western District of Michigan on five counts to include: conspiracy to distribute and possess with intent to distribute controlled substances, possession with intent to distribute controlled substances, possession of firearms in furtherance of drug trafficking,

possession of a firearm by a convicted felon and maintaining a drug-involved premises. *See* Case No. 1:22-cr-00098.

32.     The Subject Devices have remained in the possession of law enforcement since June 15, 2022, the date of seizure, and have been secured in a state such that the data contained on the Subject Devices have not been modified or altered since the date of seizure.

## TECHNICAL TERMS

33.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

  b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.

Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.     Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some

computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.   Based on my training, experience, and research, I know that the Subject Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, and GPS navigation devices. They also likely have the ability to connect to the Internet and were likely assigned Internet IP Addresses when connecting to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and whether the device was used in furtherance of drug trafficking.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

35.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of

their use, who used them, and when.  There is probable cause to believe that this

forensic electronic evidence might be on Subject Device because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. *Nature of examination.*  Based on the foregoing, and consistent with

Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of

Subject Device consistent with the warrant. The examination may require authorities

to employ techniques, including but not limited to computer-assisted scans of the

entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38.     *Manner of execution.*   Because this warrant seeks only permission to examine Subject Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

39.     I submit that this continuation supports probable cause for a search warrant authorizing the examination of Subject Device described in Attachment A to seek the items described in Attachment B.